UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x

DONNA MALONE,                                       Civil Action No.:

                              Plaintiff,            **COMPLAINT**

          -and-                                     **JURY TRIAL DEMANDED**

ESPLANADE STATEN ISLAND LLC a/k/a STATEN
ISLAND    ESPLANADE,    PATRICE    FICCO,
ALEXANDER SCHARF and AARON BOKCHIN,


                              Defendants.
----------------------------------------------------------------------x

     DONNA MALONE (hereinafter "Plaintiff" or "Malone"), by her attorneys, Pitta LLP,

alleges the following upon information and belief against the ESPLANADE STATEN ISLAND

LLC a/k/a STATEN ISLAND ESPLANADE[1] (hereinafter "Esplanade"), PATRICE FICCO

(hereinafter "Ficco"), ALEXANDER SCHARF (hereinafter "Scharf"), and AARON BOKCHIN

(hereinafter "Bokchin") (collectively, "Defendants").

<u>**NATURE OF ACTION**</u>

     1.     This is an action for compensatory and punitive damages to redress Defendants'

unlawful employment practices against Plaintiff, including their discrimination and retaliation due

to and failure to accommodate her disability in violation of Americans with Disabilities Act of

1990 (hereinafter "ADA"), 42 U.S.C. § 12101 *et seq.*, the New York State Human Rights Law,

N.Y. Exec. Law § 296 *et seq.* (hereinafter "SHRL"), and the New York City Human Rights Law,

---

[1] Defendants' discriminatory conduct is not isolated.  In 2015, the Fair Housing Justice Center filed a federal lawsuit against Defendants and its parent entities, alleging systemic discrimination against prospective tenants on the basis of on the basis of disability, religion, and race. See *Fair Hous. Justice Ctr., Inc. v. Esplanade Venture Partnership*, No. 13-CV-3600 (RLE).  The Southern District of New York accepted the parties' settlement, reached on December 11, 2014, and a stipulation for voluntary dismissal was filed on January 8, 2015.  (Doc. 81). The settlement included policy changes to conform the defendants' policies to the requirements of the Fair Housing Act.  (Doc. 79).  This prior litigation reinforces the plausibility of Plaintiff's allegations here and highlights Defendants' broader pattern of discriminatory conduct affecting employees and tenants alike.

N.Y.C. Admin. Code § 8-107 *et seq*. (hereinafter "CHRL"), discrimination and retaliation due to gender in violation of Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), as amended, 42 U.S.C. §§ 2000e, *et seq*., and the Age Discrimination in Employment Act of 1967 (hereinafter "ADEA"), 29 U.S.C. § 621 *et seq*., the SHRL, and CHRL.

2.    Plaintiff also seeks lost wages for Defendants' willful failure to pay Plaintiff overtime wages at the lawful rate of time and one-half her regular rate of pay for all hours worked in excess of forty (40) in a given workweek, failure to provide wage notices and statements, and retaliation for engaging in protected activity in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. (hereinafter "FLSA") and New York Labor Law, Article 19 §§ 650 *et seq*. (hereinafter "NYLL").

## JURISDICTION AND VENUE

3.    The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 2000e-5(f)(3), 28 U.S.C. §§ 1331, and 1343(a)(3)-(4), 29 U.S.C.§ 216(b), and has supplemental jurisdiction over the SHRL, CHRL, and NYLL claims pursuant to 28 U.S.C. § 1367(a).

4.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants conduct business in this District and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## ADMINISTRATIVE PROCEDURES

5.    Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under Title VII.

6.    Following her termination, Malone timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission (hereinafter "EEOC"), on or about July 16, 2024, asserting claims of disability discrimination, retaliation, gender and age

discrimination, and failure to accommodate her disability, docketed EEOC Charge No. 520-2024-06612.

7.     Malone cooperated fully with the EEOC's administrative process and satisfied all procedural prerequisites to sue under federal law.

8.     On January 21, 2025, Plaintiff received the notice of right to sue issued by the EEOC in connection with the previously filed charge of discrimination.

9.     Malone has therefore exhausted all administrative remedies required under federal law as a condition precedent to initiating this civil action.

10.     This lawsuit is being commenced within 90 days of Plaintiff's receipt of this notice from the EEOC by the filing of the instant pleading.  Annexed hereto and made a part hereof as Exhibit "A" is a copy of the EEOC's Right to Sue letter.

## PARTIES

11.     Malone is a 60-year-old disabled woman, who was first hired by Esplanade in or around 2013 and was at all relevant times hereto, an employee of Defendants, as defined by all applicable statutes and attendant regulations.

12.     Plaintiff resides at 285 Mill Road, Staten Island, NY 10306.

13.     Esplanade operates an assisted living facility located at 1415 Richmond Avenue, Staten Island, New York, providing care and residential services primarily to senior residents.

14.     Upon information and belief, Defendant Ficco is an individual who, at all relevant times, held a supervisory and managerial position at the Esplanade.  Ficco exercised authority over Plaintiff's terms and conditions of employment, including hiring, discipline, supervision, and termination.  Ficco participated in the decision to terminate Plaintiff and in the refusal to provide accommodations.  Ficco qualifies as an "employer" under the ADA, ADEA, Title VII, FLSA, NYLL, SHRL, and CHRL.

3

15.    Upon information and belief, Defendant Scharf is an individual who, at all relevant times, served as an executive or high-level administrator at the Esplanade.  Scharf was involved in setting employment policy and in the oversight of personnel decisions that affected Plaintiff. Scharf had direct or indirect authority over Plaintiff's employment status and conditions, and is considered an "employer" under the ADA, ADEA, Title VII, FLSA, NYLL, NYSHRL, and NYCHRL.

16.    Upon information and belief, Defendant Bokchin is an individual who, at all relevant times, acted as an administrator, director, or facility manager at the Esplanade. Bokchin exercised supervisory authority over Plaintiff, was involved in daily operational decisions, participated in accommodation decisions, and authorized or ratified adverse employment actions against Plaintiff.  Bokchin is an "employer" within the meaning of the ADA, ADEA, Title VII, FLSA, NYLL, SHRL, and CHRL.

17.    Upon information and belief, at all times relevant to the instant matter, Defendants individually, jointly and collectively constitute an employer within the meaning of the ADA, ADEA, Title VII, FLSA, NYLL, SHRL, and CHRL.

## ALLEGATIONS OF FACTS

### Plaintiff's Working Conditions

18.    At the time of her initial employment, Malone brought with her extensive experience in management and operational roles, having previously worked in similar positions with demonstrable success.

19.    From the outset of her employment in 2013 through her departure in 2019, Malone diligently performed her duties at Esplanade, consistently demonstrating a high level of professionalism, reliability, and competence.

4

20.    During this period, Malone was assigned increasing responsibilities due to her proven capability and strong performance, ultimately holding a key administrative and operational role within the facility.

21.    At no point from 2013 to 2019 did Defendants, Esplanade management or administrators raise any significant concerns or criticisms regarding Malone's work performance or conduct.

22.    To the contrary, Malone consistently received positive performance feedback, formal and informal praise, and recognition for her contributions to the operations and resident care at Esplanade.

23.    Malone's employment period from 2013 through 2019 included specific, notable instances where she successfully navigated complex operational challenges, often stepping beyond the scope of her explicit job duties to support Esplanade's mission.

24.    During the unprecedented challenges presented by the COVID-19 pandemic beginning in early 2020, Malone demonstrated remarkable adaptability, leadership, and unwavering dedication to Esplanade's residents and staff.

25.    Despite the demanding circumstances created by the pandemic, Malone was consistently among the most reliable and dedicated employees, regularly working beyond standard hours to ensure the facility's smooth operation and compliance with health guidelines, many times without appropriate compensation despite Defendants' knowledge of the same.

26.    Esplanade's management repeatedly acknowledged Malone's instrumental role in maintaining the facility's operations and standards of care during the peak of the COVID-19 crisis.

27.    Throughout her initial tenure at Esplanade, Malone was never formally reprimanded, disciplined, or subject to negative performance evaluations.

28.     Upon information and belief, Esplanade maintained comprehensive personnel files for all employees; Malone's personnel file did not contain any negative performance reviews or documented disciplinary actions from her initial employment period.

29.     Fellow employees and subordinates consistently expressed respect and appreciation for Malone's professionalism, fairness, and supportive management style.

30.     Residents and their families frequently praised Malone for her compassionate and attentive care, often specifically requesting her involvement in resolving issues due to her known efficacy and empathetic approach.

31.     Malone was widely recognized within Esplanade as an employee who consistently went above and beyond the expectations of her official role.

32.     Notably, Malone received formal commendations and informal acknowledgments for implementing procedures that significantly improved the efficiency and quality of resident care, thereby positively affecting Esplanade's reputation and compliance record.

33.     Esplanade did not maintain or produce to Malone any contemporaneous documentation from 2013 through 2019 reflecting dissatisfaction with Malone's performance or suggesting any corrective or disciplinary actions needed.

34.     Malone departed Esplanade voluntarily in 2019, leaving the facility on good terms due to medical reasons related to a vascular disease, without any unresolved disputes or performance issues.

35.     Upon her departure in 2019, Esplanade administrators and supervisors provided Malone with positive references, reflecting their satisfaction with her job performance, reliability, and overall contributions to the organization.

36.     At the time of her voluntary departure in 2019, Malone was experiencing significant health issues that required medical treatment and intervention, specifically related to a vascular disease.

37.     The circumstances surrounding her initial employment at Esplanade from 2013 through 2019 establish Malone as a diligent, highly effective, and valued employee, free of any documented performance deficiencies or disciplinary concerns.

**Plaintiff's Rehiring and New Employment Terms (Sept. 2021–Jan. 2022)**

38.     In September 2021, Malone was rehired by Esplanade on an informal, "off-the-books" basis without clear written employment documentation.

39.     Defendants verbally assured Malone a compensation rate of $25 per hour with a guaranteed 30-hour workweek.

40.     Despite being presented as a managerial role, Malone's actual duties were largely non-discretionary, involving extensive administrative and operational responsibilities without official managerial authority or status.

41.     Malone was tasked with overseeing significant operations, including managing staff schedules, resident interactions, compliance documentation, and daily facility operations.

42.     From September 2021 through January 2022, Malone regularly exceeded the guaranteed 30-hour workweek, often working in excess of 60 hours weekly without receiving overtime compensation.

43.     Throughout this period, Esplanade failed to provide Malone with legally required wage statements or proper payroll documentation.

44.     Despite the absence of clear employment records, Malone consistently fulfilled her extensive responsibilities with the same high standard of professionalism and competence as during her initial employment.

45.    Defendants acknowledged Malone's essential role in maintaining operational continuity and high standards of care during her "off-the-books" employment period.

46.    During this period, Malone repeatedly sought clarification and formalization of her employment status, which Defendants continuously deferred or avoided addressing substantively.

47.    When Malone returned in September 2021, she was experiencing significant physical limitations and health conditions, including mobility challenges directly related to her vascular disease, which were patently obvious to Defendants.

**Disability Onset, Surgery, and Initial Accommodation (Jan. 2022–Mid- 2022)**

48.    In January 2022, Malone underwent a significant surgical procedure due to a worsening vascular disease, resulting in the amputation of her leg.

49.    Despite the severity of this surgery, Malone demonstrated an exceptional commitment to her role and returned to work for Defendants shortly thereafter.

50.    Upon her return, Malone initially relied on a wheelchair to fulfill her duties, and later transitioned to using a prosthetic limb. She was never advised that she would need to be on her feet for 10 hours or be able to lift 50 pounds from a wheelchair.

51.    Despite her physical limitations, Malone continued performing her responsibilities diligently and effectively, ensuring operational continuity at Esplanade.

52.    Initially, Defendants appeared supportive, verbally acknowledging Malone's resilience and strong work ethic in the immediate aftermath of her surgery.

53.    Nevertheless, Esplanade failed to engage in any formal or documented interactive process to clearly address and accommodate Malone's medical condition and mobility needs.

54.    Malone proactively communicated her accommodation needs to management, specifically requesting reasonable adjustments to facilitate her continued effective performance.

8

55.    Defendants did not meaningfully respond to these requests or propose alternative accommodations to assist Malone with her newly developed disability.

56.    Despite Defendant's lack of formal accommodations, Malone successfully continued to fulfill all duties required by her role, maintaining a consistent standard of performance.

57.    Malone's colleagues and subordinates regularly witnessed and admired her dedication and adaptability in overcoming the physical barriers presented by her disability.

58.    Throughout early to mid-2022, Malone consistently demonstrated her capability to perform her essential job functions effectively, notwithstanding her physical limitations and the lack of formal accommodations from Defendants.

59.    Despite her evident commitment and effectiveness, Defendants increasingly displayed an attitude of indifference, neglect, or frustration toward Malone's accommodation needs and physical condition.

**Hostile Work Environment and Disability Discrimination (Mid -2022–Early 2023)**

60.    Beginning in mid-2022, Esplanade administrators and supervisors increasingly exhibited hostility toward Malone directly related to her disability.

61.    Malone was regularly subjected to negative and discriminatory remarks about her mobility and physical appearance by Esplanade management, including a senior administrator who intimated that Malone was not the image Defendants want to present when families visit.

62.    During a meeting with Ficco and Bokchin, Malone was labeled as "the one in the wheelchair," while two older colleagues were called "getting old," another was "slow," and another referred to as "the one with the child".

63.    Ficco told Malone she would not "again deal with" accommodating her need for a wheelchair "for another few months of employment."

9

64.    When Malone entered rooms, she was suggested to sit elsewhere and out of the way.

65.    On one occasion, Malone overheard a facility director remark to other staff about slowness referring to Malone's wheelchair.

66.    Defendants also subjected her to embarrassment, falsely accusing her of incontinence, when Ficco allegedly told the head of housekeeping to give Malone pads for her bed, which caused Malone significant embarrassment.

67.    Esplanade administrators also excluded Malone from critical meetings and workplace activities that were directly relevant to her job responsibilities, such as weekly leadership briefings she had previously attended, without offering any explanation.

68.    Malone experienced increased social isolation at work, including being intentionally excluded from holiday staff events and team lunches, while other managers were invited.

69.    Despite working 60+ hours per week, Malone rarely saw prospective resident tours. The tours were allegedly deliberately scheduled during her medical appointments to ensure she was not seen in a wheelchair. Indeed, Defendants specifically excluded Malone from certain areas of the living facility and inspections involving prospective residents and families, explicitly stating, "We can't have her seen wheeling around with them—it's not a good look."

70.    In March 2023, Ficco posted signs stating that audio surveillance had been installed throughout the workplace without informing Malone or obtaining consent from staff.

71.    Upon information and belief, Esplanade's maître d' resigned because of the surveillance, further evidencing its chilling effect on employees

72.     Defendants subjected Malone to heightened scrutiny, including sudden implementation of checklists and time-tracking protocols only applicable to her role, which, upon information and belief, were not imposed on her peers.

73.     Malone's workspace was relocated to a more isolated and less accessible area of the facility, which made it physically more difficult for her to move between departments and oversee staff, despite her objections.

74.     Defendants repeatedly undermined Malone's authority by bypassing her in decisions involving her departments, directing her subordinates to report directly to other administrators or outside consultants instead.

75.     Esplanade openly questioned Malone's competence based on her disability, with one supervisor stating during a staff meeting: "We need someone more agile in that position," while looking directly at Malone.

76.     These hostile actions and discriminatory remarks caused Malone to suffer emotional distress, including anxiety, sleeplessness, and a growing fear of losing her livelihood because of her disability.

77.     Despite the discriminatory environment, Malone continued to exceed expectations in her role, maintaining departmental efficiency and compliance with regulatory standards.

78.     Malone filed internal complaints and raised concerns directly with Ficco and human resources about the discriminatory treatment, but no investigation was ever conducted, and no remedial action was ever taken.

**Wage and Hour Violations (Throughout Employment, Focused on Late 2021–2023)**

79.     From September 2021 through her termination in 2023, Malone was employed by Defendants without being provided a formal written agreement outlining her job classification, wage rate, or working hours.

11

80. Malone was consistently paid off the books during this period, receiving cash or undocumented payments without wage statements or tax documentation.

81. Defendants failed to furnish Malone with pay stubs, W-2 forms, or 1099s, in violation of New York Labor Law requirements for recordkeeping and wage notice.

82. Defendants classified Malone in a manner inconsistent with her actual job duties, treating her as a managerial employee while assigning her substantial non-discretionary and manual responsibilities.

83. Malone was routinely required to work between 60 and 65 hours per week, far exceeding the verbally guaranteed 30-hour workweek she was promised at the time of rehire.

84. Despite regularly working in excess of 40 hours per week, Malone was never paid overtime compensation as required by the FLSA and NYLL.

85. Malone's duties included physically demanding tasks such as responding to patient emergencies, covering absent staff, transporting supplies, and handling paperwork and compliance tasks without support.

86. Malone's daily shifts were not tracked or recorded in any timekeeping system, further enabling Defendants' failure to comply with federal and state wage and hour laws.

87. On multiple occasions, Malone was required to be on call overnight or to sleep at the facility without receiving any compensation for those hours.

88. Defendants never compensated Malone for these on-site overnight duties, nor for being available around the clock to respond to operational issues.

89. When Malone raised concerns regarding unpaid hours and lack of wage documentation, Defendants ignored her inquiries and took no steps to rectify the violations.

12

90.     Malone also expressed concerns that Defendants' payroll practices were being selectively applied, with certain favored employees receiving formal pay and records while others did not.

91.     Malone's compensation structure was unlawfully structured to obscure the employer-employee relationship and avoid compliance with labor and tax obligations.

92.     Defendants never provided Malone with the wage notices required under NYLL Section 195(1), nor did it provide written notice of her rate of pay or regular payday.

93.     Defendants' failure to maintain proper payroll records and classify Malone appropriately was willful and part of a broader pattern of wage theft.

94.     The lack of clear employment documentation also prevented Malone from applying for benefits, including paid sick leave, unemployment, or disability assistance during her periods of medical need.

95.     Defendants' actions deprived Malone of her lawful earnings, subjected her to financial instability, and were in violation of both federal and state wage and hour protections.

**Requests for Disability Accommodation and Retaliation**

96.     In early 2023, Malone began to experience complications with her prosthetic leg, causing her significant pain and making mobility increasingly difficult.

97.     Malone notified Esplanade's management of her medical condition and requested a reasonable accommodation to adjust her schedule and workload to allow for recovery and adjustment, as well as implement equipment installations to render the "back of the [Esplanade] house" mobility device accessible.

98.     Esplanade failed to initiate any formal interactive process in response to Malone's request for accommodation.

13

99.     Instead of engaging in good-faith discussions about accommodation options, Esplanade's management expressed frustration and reluctance to accommodate Malone's disability.

100.    In February 2023, after Malone explained her prosthetic rehabilitation could take up to another year, Ficco explicitly told Malone, "we're not doing this another year," with others hearing it in the kitchen.

101.    When Malone requested a closer parking space for her handicap-accessible vehicle, Defendants denied the request.

102.    Thereafter, Malone personally paid for wheelchair ramps to access workspaces like the walk-in freezer.  She was told she would not be reimbursed, despite the ramps being necessary for her disability.

103.    Most egregiously, Defendants did not even engage in a dialogue with Malone regarding an appropriate accommodation that would have permitted her to work alongside her colleagues.

104.    At no point did Defendants indicate or suggest that accommodating Malone presented an undue hardship – nor could it – given the fact that it had the means and resources to do so for many of its patients.

105.    Malone's request for accommodation was met with increased hostility and marginalization from her supervisors.

106.    Within weeks of her accommodation request, Defendants escalated scrutiny of Malone's work, began questioning her job performance, and laid the groundwork for her termination.

107.    Defendants made no effort to reassign Malone to any alternate role, reduce her workload, or consider remote or hybrid options despite knowing of her physical limitations.

4908-9501-2409 v.1

108.    In addition to disability-related accommodations, Malone also raised concerns about ongoing wage violations, including unpaid overtime and lack of legally required wage and tax documentation.

109.    Defendants took no steps to investigate or correct the wage issues Malone identified and instead further retaliated by isolating her and excluding her from key meetings and decisions.

110.    The pattern of adverse actions following Malone's protected activities, including requesting accommodations and opposing wage violations, demonstrates clear retaliatory motive.

111.    Defendants' failure to accommodate Malone, coupled with its retaliatory conduct, created an intolerable and discriminatory work environment.

112.    Malone continued to fulfill her job duties during this time despite the physical pain and emotional distress caused by management's actions.

113.    Rather than recognize Malone's continued contributions, Defendants weaponized her medical condition to portray her as ineffective and to justify its decision to remove her from her position.

114.    Defendants' conduct following Malone's accommodation request directly contributed to the decision to terminate her employment and further compounded the discriminatory treatment she endured.

**Pretextual Performance Issues and Consultant Involvement (2023)**

115.    In 2023, shortly after Malone requested accommodations for her disability and raised wage concerns, Defendants retained a consultant named Joseph Franqui (hereinafter "Consultant") to review operations.

116.    The decision to retain the Consultant occurred immediately after Malone's protected activities, suggesting the consultant's engagement was pretext for building a case against her.

117.    Malone had already implemented multiple cost-saving measures and operational improvements prior to the Consultant's arrival, which had yielded demonstrable benefits for the facility.

118.    Esplanade management did not provide Malone with any formal performance improvement plan, warnings, or critiques prior to or during the Consultant's assessment.

119.    The Consultant never conducted a formal review with Malone or interviewed her substantively about her practices, procedures, or the facility's operations.

120.    Despite her efforts and accomplishments, the Consultant made dismissive comments about Malone's work, including in internal communications stating, "she can't do much herself."

121.    Malone was not given any opportunity to respond to or rebut the Consultant's findings before management acted on them.

122.    The alleged performance issues raised by the Consultant were vague, conclusory, and not supported by any contemporaneous and directly relevant documentation from Defendants.

123.    Defendants retroactively relied on the Consultant's report to justify terminating Malone, even though the actions criticized in the report had already been addressed or implemented by her or were never explicitly provided to her with sufficient time to implement the same.

124.    No similarly situated employees without disabilities or who had not engaged in protected activity were subjected to the Consultant's review or pretextual performance critiques.

125.    The Consultant's role and findings were weaponized by Defendants to lend false legitimacy to a retaliatory and discriminatory termination decision.

16

126.    The Consultant's recommendations failed to account for Malone's disability, the constraints imposed by her condition, or the lack of accommodations provided to her by Defendants.

127.    Rather than using the Consultant's engagement to support or reinforce Malone's efforts, Defendants used it to manufacture performance concerns and sideline her leadership.

128.    Malone was never provided with the final written report by the Consultant nor afforded the opportunity to comment on or contest its conclusions.

129.    The timeline and content of the consultant's engagement and findings directly correlate with Malone's accommodation requests and internal wage-related complaints, supporting a strong inference of retaliatory motive.

130.    Upon information and belief, Plaintiff's authority and leadership were questioned and over-scrutinized by the Esplanade's male owners and the Consultant, as compared to Plaintiff's male colleagues, who routinely received better treatment, support, and growth opportunities.    Moreover, Plaintiff was excluded from meetings and functions where male counterparts were included.

**Termination and Consequences (2023–present)**

131.    On or about September 23, 2023, Defendants terminated Malone's employment, providing vague and shifting explanations centered on alleged performance deficiencies.

132.    The stated reasons for Malone's termination, including claims that she failed to implement consultant recommendations, were demonstrably false or pretextual.

133.    Malone had already executed or initiated many of the Consultant's recommendations prior to her termination, and no performance issues had been documented contemporaneously.

134.    Defendants did not follow any progressive discipline or performance review process prior to terminating Malone, in violation of its own internal practices and industry standards.

135.    Malone was not afforded a meaningful opportunity to address or respond to any of the allegations that purportedly formed the basis of her termination.

136.    Malone's termination followed closely on the heels of her protected activity, including requesting accommodations and raising wage-related concerns.

137.    The timing and circumstances of Malone's termination give rise to a strong inference of discriminatory and retaliatory intent.

138.    During the termination meeting, Defendants' administrator made comments that suggested her disability was a motivating factor, including reference to needing "someone who can move around more."

139.    Defendants made no effort to reassign Malone or explore less severe alternatives, such as demotion, transfer, or extended leave.

140.    The termination severed Malone's access to income, housing (as she had been living on-site), and health insurance during a time of medical vulnerability.

141.    As a result of the termination, Malone suffered immediate and lasting financial harm, including loss of wages, benefits, and retirement contributions.

142.    Malone also experienced severe emotional distress, anxiety, humiliation, and loss of dignity as a result of her abrupt and discriminatory discharge.

143.    Malone's professional reputation was damaged by Defendants' termination decision, which cast false aspersions on her competence and performance.

144.    Since her termination, Malone has struggled to secure comparable employment due to the stigma of her dismissal and the lingering effects of Defendants' discriminatory conduct.

145.    The cumulative effect of Defendants' conduct – including its failure to accommodate, retaliation, wage violations, and discriminatory termination – has caused Malone substantial harm, both economic and emotional.

**FIRST CAUSE OF ACTION**
**DISCRIMINATION BASED ON DISABILITY IN VIOLATION OF THE ADA**
**AGAINST DEFENDANT ESPLANADE**

146.    Plaintiff repeats and realleges ¶¶ 1 through 145 of the Complaint as if fully set forth herein.

147.    At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the ADA, having a physical impairment – vascular disease and resulting leg amputation – that substantially limited one or more major life activities, including walking and mobility.

148.    Plaintiff was able to perform the essential functions of her position, with or without reasonable accommodation.

149.    Defendants are employers subject to the ADA and were aware of Plaintiff's disability.

150.    Despite her qualifications and effective performance, Plaintiff was subjected to discriminatory treatment by Defendants because of her disability, including being ridiculed, excluded from job-related functions, and ultimately terminated.

151.    Defendants made discriminatory remarks and took adverse employment actions against Plaintiff that were motivated, at least in part, by animus toward her disability and need for accommodation.

152.    Defendants failed to provide Plaintiff with reasonable accommodations, and instead used her disability and related physical limitations as a justification for removing her from her role.

19

153.    Defendants' conduct constituted unlawful discrimination against Plaintiff on the basis of her disability in violation of the ADA.

154.    Defendants' actions were intentional, willful, and/or showed reckless indifference to Plaintiff's federally protected rights.

155.    Plaintiff's eventual termination was directly and proximately connected to her medical disability and related attempts to have them accommodated.

156.    Plaintiff, at the time of her termination, was dutifully performing her responsibilities.

157.    As a result of said termination, Plaintiff has suffered pecuniary losses in the form of, *inter alia*, loss of her sole source of income, loss of health insurance and prescription coverage for necessary and potentially life-threatening medication, loss of reputation, loss of housing, loss of consortium, and loss of personal and business relationships.

158.    Finally, since Plaintiff's unlawful termination, she has continuously and consistently looked for comparable, new employment, but to date, has not been able to secure said employment.

159.    Based upon the foregoing, and given the fact that Plaintiff has satisfied its "minimal burden," *Vuona v. Merrill Lynch & Co., Inc.*, 919 F.Supp.2d 359 (S.D.N.Y. 2013), Plaintiff has sufficiently alleged that she was subjected to a discriminatory employment practices, namely Defendants' refusal to provide a reasonable accommodation and then terminating her was caused by Plaintiff's membership in several protected classes of employees, including disability.

160.    Accordingly, Plaintiff seeks all lawful remedies under the applicable statutes, including but not limited to back pay, front pay, compensatory damages, punitive damages, attorneys' fees, administrative costs, and all other relief that this Court deems just and proper.

## SECOND CAUSE OF ACTION
## FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADA
## <u>AGAINST DEFENDANT ESPLANADE</u>

161.    Plaintiff repeats and realleges ¶¶ 1 through 160 of the Complaint as if fully set forth herein.

162.    An employer must provide a reasonable accommodation to an eligible employee, unless it would pose an undue hardship.

163.    Where a requested accommodation would result in undue hardship, the employer must offer an alternative accommodation if one is available absent undue hardship.

164.    Plaintiff was a qualified individual with a disability under the ADA, able to perform the essential functions of her job with or without reasonable accommodation.

165.    Plaintiff notified Defendants of her disability and requested reasonable accommodations, including adjustments to her schedule and workload, closer parking and in facility ramps, to account for complications with her prosthetic limb and wheelchair.

166.    Defendants were aware of Plaintiff's need for accommodation but failed to engage in a good-faith interactive process as required by the ADA.

167.    Rather than offer reasonable accommodations, Defendants responded to Plaintiff's request with indifference and hostility.

168.    Defendants failed to provide any reasonable accommodations, and instead escalated scrutiny, excluded Plaintiff from workplace functions, and ultimately terminated her employment.

169.    Defendants' refusal to accommodate Plaintiff's disability constitutes a violation of the ADA.

170.    As a direct and proximate result of Defendants' failure to accommodate her disability, Plaintiff suffered damages including but not limited to lost wages, loss of employment-related benefits, emotional distress, and reputational harm.

171.    Defendants' actions were taken in bad faith, were willful, and demonstrated a reckless disregard for Plaintiff's federally protected rights.

172.    Accordingly, Plaintiff seeks all lawful remedies under the applicable statutes, including but not limited to back pay, front pay, compensatory damages, punitive damages, attorneys' fees, administrative costs, and all other relief that this Court deems just and proper.

## THIRD CAUSE OF ACTION
## RETALIATION IN VIOLATION OF THE AMERICANS WITH THE ADA
## AGAINST DEFENDANT ESPLANADE

173.    Plaintiff repeats and realleges ¶¶ 1 through 172 of the Complaint as if fully set forth herein.

174.    Plaintiff engaged in protected activity under the ADA, including requesting reasonable accommodations for her disability and opposing disability-related discrimination in the workplace.

175.    Defendants were aware of Plaintiff's protected activity and regarded her requests and complaints as adverse to their interests.

176.    Following Plaintiff's protected conduct, Defendants subjected her to adverse employment actions, including increased scrutiny, marginalization, false allegations of performance deficiencies and incontinence, and ultimately termination.

177.    The temporal proximity between Plaintiff's protected conduct and the adverse actions taken against her gives rise to an inference of retaliatory motive.

4908-9501-2409 v.1

178.     Defendants failed to articulate a legitimate, non-retaliatory reason for their actions or their stated reasons were pretextual.

179.     Defendants' retaliatory conduct was undertaken with malice or with reckless indifference to Plaintiff's rights under the ADA.

180.     As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered damages including, but not limited to, lost wages, emotional distress, reputational harm, and other compensatory and consequential damages.

### FOURTH CAUSE OF ACTION
### DISCRIMINATION UNDER TITLE VII (SEX)
### AGAINST DEFENDANT ESPLANADE

181.     Plaintiff repeats and realleges ¶¶ 1 through 180 of the Complaint as if fully set forth herein.

182.     Title VII prohibits Defendants from discriminating against employees based on their sex.  *See* 42 U.S.C. § 2000e-2(a)(1).

183.     In order to sufficiently allege a *prima facie* case under Title VII: i) an individual demonstrates that he/she is a member of a protected class; ii) an individual demonstrates that his/her employer knew or had reason to know that said individual is a member of a protected class; iii) an individual was caused to suffer from an adverse employment action effectuated by his/her employer; and iv) his/her employer effectuated said adverse employment action as a result of an individual's membership in a protected class.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

184.     Defendants are employers within the meaning of Title VII and were at all relevant times engaged in an industry affecting commerce and employing the requisite number of employees.

185.    Plaintiff is a member of a protected class under Title VII based on her gender (female).

186.    During her employment, Plaintiff was subjected to disparate treatment, including heightened scrutiny, exclusion from opportunities, and demeaning conduct by Defendants Scharf and Bokchin and the Consultant who questioned her authority and leadership.

187.    Plaintiff's contributions were minimized or ignored by male leadership, including Defendants Scharf and Bokchin, who routinely favored male colleagues with better treatment, support, and opportunities.

188.    Plaintiff was excluded from meetings and functions where male counterparts were included, despite her seniority and operational role.

189.    Upon information and belief, the Consultant and male colleagues with inferior experience or performance records were retained, accommodated, or reassigned rather than terminated.

190.    Defendants' actions were motivated in whole or in part by unlawful gender-based animus, in violation of Title VII.

191.    As a direct and proximate result of Defendants' unlawful gender discrimination, Plaintiff suffered damages, including but not limited to lost income, reputational harm, emotional distress, and loss of professional opportunities.

192.    Defendants' actions were willful, wanton, and undertaken with malice or reckless disregard for Plaintiff's federally protected rights.

193.    Accordingly, Plaintiff seeks all lawful remedies under the applicable statutes, including but not limited to back pay, front pay, compensatory damages, punitive damages, attorneys' fees, administrative costs, and all other relief that this Court deems just and proper.

**FIFTH CAUSE OF ACTION**

**RETALIATION UNDER TITLE VII (SEX)**
**AGAINST DEFENDANT ESPLANADE**

194.    Plaintiff repeats and realleges ¶¶ 1 through 193 of the Complaint as if fully set forth herein.

195.    Plaintiff engaged in protected activity under Title VII, 42 U.S.C. § 2000e-3(a), by opposing discriminatory conduct and treatment based on her gender.

196.    Plaintiff's protected activity included internal complaints and objections to the disparate treatment and gender-based hostility she experienced in the workplace.

197.    Defendants were aware of Plaintiff's protected activity.

198.    Following Plaintiff's complaints, Defendants subjected her to materially adverse employment actions, including but not limited to increased scrutiny, marginalization, assignment of unfavorable duties, and ultimately termination.

199.    There exists a causal connection between Plaintiff's protected activity and the adverse employment actions taken against her.

200.    Defendants' stated reasons for the adverse actions were pretextual and intended to mask an unlawful retaliatory motive.

201.    As a direct and proximate result of Defendants' retaliation in violation of Title VII, Plaintiff suffered damages, including emotional distress, reputational harm, lost income, and other related harms.

202.    Defendants' actions were willful and undertaken with malice or reckless disregard for Plaintiff's federally protected rights.

203.    Accordingly, Plaintiff seeks all lawful remedies under the applicable statutes, including but not limited to back pay, front pay, compensatory damages, punitive damages, attorneys' fees, administrative costs, and all other relief that this Court deems just and proper.

## SIXTH CAUSE OF ACTION
## DISCRIMINATION IN VIOLATION OF THE ADEA
## AGAINST DEFENDANT ESPLANADE

204.    Plaintiff repeats and realleges ¶¶ 1 through 203 of the Complaint as if fully set forth herein.

205.    At all relevant times, Plaintiff was over the age of 40 and therefore a member of the class protected under the ADEA.

206.    Defendants are employers within the meaning of the ADEA and are engaged in an industry affecting commerce with twenty or more employees.

207.    Plaintiff was qualified for her position and satisfactorily performed the essential functions of her job throughout her employment.

208.    Despite her qualifications and performance, Defendants subjected Plaintiff to disparate treatment, including heightened scrutiny, unfavorable and impossible assignments, and exclusion from opportunities afforded to younger colleagues including the Consultant.

209.    Defendants made discriminatory remarks about Plaintiff's age and capacity to perform based on stereotypical assumptions associated with aging compounded by her disabilities.

210.    Plaintiff's age was a motivating factor in Defendants' decision to terminate her employment.

211.    Upon information and belief, younger employees and colleagues with comparable or inferior performance histories were treated more favorably and were retained or reassigned instead of terminated.

212.    Defendants failed to provide Plaintiff with any legitimate, non-discriminatory explanation for their adverse treatment and ultimate termination of her employment.

4908-9501-2409 v.1

213.    As a direct and proximate result of Defendants' unlawful age discrimination, Plaintiff has suffered and continues to suffer damages, including lost wages, lost benefits, emotional distress, and reputational harm.

214.    Defendants' conduct was willful and undertaken with knowledge or reckless disregard of Plaintiff's statutorily protected rights under the ADEA.

215.    Accordingly, Plaintiff seeks all lawful remedies under the applicable statutes, including but not limited to back pay, front pay, compensatory damages, punitive damages, attorneys' fees, administrative costs, and all other relief that this Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**FAILURE TO PAY OVERTIME WAGES (FLSA)**
**AGAINST DEFENDANTS**

216.    Plaintiff repeats and realleges ¶¶ 1 through 215 of the Complaint as if fully set forth herein.

217.    At all relevant times, Plaintiff was employed by Defendants within the meaning of the FLSA.

218.    Defendants were and are employers engaged in interstate commerce and/or in the production of goods for commerce or constitute or a hospital, nursing home or other residential health care facility, school or preschool, or public agency within the meaning of the FLSA.

219.    Plaintiff regularly worked more than 40 hours per week throughout her employment with Defendants.

220.    Defendants willfully failed to pay Plaintiff overtime wages at the lawful rate of time and one-half her regular rate of pay for all hours worked in excess of 40 in a given workweek.

221.    Defendants failed to maintain accurate records of Plaintiff's hours worked, as required by the FLSA.

222.    The violations of the FLSA by Defendants were knowing, willful, and intentional.

27

223.    As a result of Defendants' FLSA violations, Plaintiff suffered damages, including lost wages and liquidated damages.

224.    Plaintiff is entitled to recover from Defendants her unpaid overtime compensation, an additional equal amount as liquidated damages, reasonable attorneys' fees, and costs pursuant to 29 U.S.C. § 216(b).

**EIGHTH CAUSE OF ACTION**
**RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY (FLSA)**
**AGAINST DEFENDANTS**

225.    Plaintiff repeats and realleges ¶¶ 1 through 224 of the Complaint as if fully set forth herein.

226.    At all relevant times, Plaintiff was employed by Defendants within the meaning of the FLSA.

227.    Plaintiff engaged in protected activity under the FLSA by raising concerns and complaints regarding unpaid overtime wages and other wage-related violations.

228.    Defendants were aware of Plaintiff's protected activity and opposed her efforts to enforce compliance with federal wage and hour laws.

229.    Following Plaintiff's protected complaints, Defendants subjected her to adverse employment actions including heightened scrutiny, reduction in responsibilities, exclusion from meetings, and termination.

230.    There exists a causal connection between Plaintiff's protected activity and the adverse actions taken by Defendants.

231.    Defendants' conduct was willful and intended to retaliate against Plaintiff for asserting her rights under the FLSA.

232.    As a result of Defendants' unlawful retaliation, Plaintiff has suffered damages including lost wages, loss of benefits, emotional distress, reputational damage, and other compensatory harms.

233.    Plaintiff is entitled to all remedies available under the FLSA, including but not limited to back pay, liquidated damages, attorneys' fees, and costs of litigation.

**NINTH CAUSE OF ACTION**
**FAILURE TO PAY OVERTIME WAGES (NYLL)**
**AGAINST DEFENDANTS**

234.    Plaintiff repeats and realleges ¶¶ 1 through 233 of the Complaint as if fully set forth herein.

235.    At all relevant times, Plaintiff was employed by Defendants within the meaning of the New York Labor Law.

236.    Plaintiff regularly worked more than 40 hours per week for Defendants.

237.    Defendants failed to pay Plaintiff overtime wages at one and one-half times her regular rate of pay for hours worked in excess of 40 in a workweek, as required by NYLL and applicable wage orders.

238.    Defendants failed to maintain and preserve accurate records of Plaintiff's hours worked, in violation of NYLL § 661 and applicable regulations.

239.    Defendants' failure to pay overtime compensation to Plaintiff was willful and not in good faith.

240.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been damaged in an amount to be determined at trial, including but not limited to unpaid overtime wages, liquidated damages, interest, attorneys' fees, and costs

**TENTH CAUSE OF ACTION**
**FAILURE TO PROVIDE WAGE NOTICES AND WAGE STATEMENTS (NYLL)**
**AGAINST DEFENDANTS**

241.    Plaintiff repeats and realleges ¶¶ 1 through 240 of the Complaint as if fully set forth herein.

242.    At all relevant times, Defendants failed to provide Plaintiff with a written notice of her rate of pay, regular payday, and other required information at the time of hire, in violation of NYLL § 195(1).

243.    Defendants failed to furnish Plaintiff with accurate wage statements on each payday containing the hours worked, rate of pay, gross wages, deductions, and net wages, in violation of NYLL § 195(3).

244.    These violations were knowing, willful, and not in good faith.

245.    As a result of these violations, Plaintiff is entitled to statutory damages, attorneys' fees, costs, and all other relief permitted under NYLL §§ 198(1-b) and 198(1-d).

## ELEVENTH CAUSE OF ACTION
## RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY (NYLL)
## AGAINST DEFENDANTS

246.    Plaintiff repeats and realleges ¶¶ 1 through 245 of the Complaint as if fully set forth herein.

247.    Plaintiff engaged in protected activity under the New York Labor Law, including but not limited to making internal complaints and raising concerns regarding unpaid overtime wages, failure to appropriately document wage payments and deduct taxes, and other wage violations.

248.    Defendants were aware of Plaintiff's protected complaints under the NYLL.

249.    Following Plaintiff's complaints, Defendants took adverse employment actions against her, including increased scrutiny, unfounded criticism of her performance, marginalization, and termination.

250.    A causal connection exists between Plaintiff's protected activity and the adverse actions taken against her.

251.    Defendants' retaliatory actions were willful and not taken in good faith.

252.    As a direct and proximate result of Defendants' retaliation in violation of the NYLL, Plaintiff suffered damages including lost wages, lost benefits, emotional distress, reputational harm, and other compensatory and consequential damages.

253.    Plaintiff is entitled to recover all remedies available under NYLL § 215, including back pay, front pay, liquidated damages, compensatory damages, attorneys' fees, and costs.

## TWELFTH CAUSE OF ACTION
## DISABILITY DISCRIMINATION (SHRL)
## <u>AGAINST DEFENDANTS</u>

254.    Plaintiff repeats and realleges ¶¶ 1 through 253 of the Complaint as if fully set forth herein.

255.    Plaintiff's claims brought pursuant to the SHRL are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp.*, 411 U.S. 792, *supra*.

256.     Under this framework, Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination or retaliation.  This burden is minimal and is satisfied by showing: (1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination or retaliation.

257.    SHRL, which lacks the "severe and pervasive requirement" for claims accruing after October 11, 2019, requires allegations of "inferior terms, conditions, or privileges of

employment because of [a plaintiff's] membership in one or more protected categories." *Tortorici v. Bus-Tev, LLC*, No. 17-CV-7507 (PAC) (KHP), 2021 WL 4177209, at *13 (S.D.N.Y. Sept. 14, 2021).

258.    Once the prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.

259.    If the employer meets this burden, the presumption of discrimination drops out and the burden shifts back to Plaintiff to demonstrate that the proffered reason is pretextual and that discrimination was the real reason for the employment action.

260.    Plaintiff is a qualified individual with a disability within the meaning of the SHRL.

261.    Plaintiff was subjected to disparate treatment by Defendants due to her disability, including but not limited to ridicule, exclusion, denial of workplace access, and termination.

262.    Defendants discriminated against Plaintiff by failing to treat her on equal terms with non-disabled employees.

263.    As pleaded throughout this Complaint, Plaintiff will demonstrate that Defendants' stated reasons are pretextual and unsupported by contemporaneous evidence, and that the adverse actions were the product of discriminatory animus and retaliation.

264.    Defendants' conduct constitutes unlawful disability discrimination in violation of SHRL.

265.    As a direct and proximate result, Plaintiff suffered damages including lost wages, lost benefits, emotional distress, and reputational harm.

### THIRTEENTH CAUSE OF ACTION
### FAILURE TO ACCOMMODATE VIOLATION (SHRL)
### AGAINST DEFENDANTS

4908-9501-2409 v.1

266.     Plaintiff repeats and realleges ¶¶ 1 through 265 of the Complaint as if fully set forth herein.

267.     Plaintiff requested reasonable accommodations for her known disability, including minor scheduling and workload adjustments.

268.     Defendants failed to engage in a good faith interactive process and denied Plaintiff's requests without justification.

269.     Defendants' failure to provide reasonable accommodations violated SHRL.

270.     As a result, Plaintiff suffered damages, including lost compensation, emotional distress, and other non-economic harms.

### FOURTEENTH CAUSE OF ACTION
### RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY (SHRL)
### AGAINST DEFENDANTS

271.     Plaintiff repeats and realleges ¶¶ 1 through 270 of the Complaint as if fully set forth herein.

272.     Plaintiff engaged in protected activity under SHRL, including requesting accommodations and objecting to discrimination.

273.     Defendants took adverse actions against Plaintiff, including heightened scrutiny and termination, as a result of her protected activity.

274.     A causal connection exists between the protected activity and the adverse actions.

275.     Defendants' retaliation was unlawful and caused Plaintiff to suffer damages.

### FIFTEENTH CAUSE OF ACTION
### SEX DISCRIMINATION (SHRL)
### AGAINST DEFENDANTS

276.     Plaintiff repeats and realleges ¶¶ 1 through 275 of the Complaint as if fully set forth herein.

4908-9501-2409 v.1

277. Plaintiff is a member of a protected class based on gender.

278. Defendants subjected Plaintiff to disparate treatment based on her gender, including exclusion from decision-making and imposition of a hostile environment.

279. Similarly situated male employees were treated more favorably.

280. Defendants' conduct constitutes unlawful gender discrimination under SHRL.

281. Plaintiff suffered damages as a result.

**SIXTEENTH CAUSE OF ACTION**
**AGE DISCRIMINATION (SHRL)**
**AGAINST DEFENDANTS**

282. Plaintiff repeats and realleges ¶¶ 1 through 281 of the Complaint as if fully set forth herein.

283. At all relevant times, Plaintiff was over the age of 40 and protected under SHRL.

284. Defendants treated Plaintiff less favorably than younger employees and the Consultant with comparable or lesser qualifications.

285. Plaintiff was subject to discriminatory comments, marginalized, and ultimately terminated due to her age.

286. Defendants' conduct was willful and without lawful justification.

287. Plaintiff suffered economic and emotional damages as a result.

**SEVENTEENTH CAUSE OF ACTION**
**DISABILITY DISCRIMINATION (CHRL)**
**AGAINST DEFENDANTS**

288. Plaintiff repeats and realleges ¶¶ 1 through 287 of the Complaint as if fully set forth herein.

289.    The CHRL must be construed broadly in favor of "discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Williams v NYC Hous. Auth.*, 61 AD3d 62, 66 (1st Dept 2009) (internal citations and quotations omitted).

290.    Claims under the CHRL are not subject to the McDonnell Douglas burden-shifting framework unless the parties specifically adopt it.  Courts applying the CHRL instead focus on the existence of differential treatment and whether discriminatory or retaliatory conduct played any role in the employer's actions.

291.    CHRL claimants need only allege that they were treated "less well, at least in part for a discriminatory reason." *Moore v. Verizon*, No. 13-CV-6467 (RJS), 2016 WL 825001, at *13 (S.D.N.Y. Feb. 5, 2016).

292.    Plaintiff need only show that she was treated less well than other employees due to her protected status or activity, and that unlawful discrimination or retaliation was one motivating factor in the challenged conduct.

293.    Defendants may avoid liability under the CHRL only by demonstrating that the conduct complained of was nothing more than a petty slight or trivial inconvenience.

294.    Plaintiff's pleadings easily satisfy the more liberal standard under the CHRL and support claims that must be resolved by a jury.

295.    Plaintiff is a qualified individual with a disability within the meaning of the CHRL.

296.    Defendants discriminated against Plaintiff by subjecting her to unequal terms and conditions of employment because of her disability.

297.    Defendants' conduct includes ridicule, exclusion, denial of access, and termination based on disability.

298.     As detailed above, Plaintiff's treatment by Defendants included concrete adverse employment actions, exclusion, ridicule, denial of accommodations, and termination – all of which fall squarely within the CHRL's broad protections against disability discrimination.

299.     As a direct result, Plaintiff suffered substantial economic and emotional damages.

## EIGHTEENTH CAUSE OF ACTION
## FAILURE TO ACCOMMODATE PLAINTIFF'S DISABILITY (CHRL)
## AGAINST DEFENDANTS

300.     Plaintiff repeats and realleges ¶¶ 1 through 299 of the Complaint as if fully set forth herein.

301.     Plaintiff requested reasonable accommodations for her known disability, including adjustments to her schedule and duties.

302.     Defendants failed to meaningfully engage in the cooperative dialogue required by the CHRL.

303.     Defendants failed to provide reasonable accommodations that would have enabled Plaintiff to perform her job.

304.     These failures constitute violations of CHRL.

305.     Plaintiff suffered damages as a result, including lost income and emotional distress.

## NINETEENTH CAUSE OF ACTION
## RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY (CHRL)
## AGAINST DEFENDANTS

306.     Plaintiff repeats and realleges ¶¶ 1 through 305 of the Complaint as if fully set forth herein.

307.     Plaintiff engaged in protected activity under the CHRL, including seeking accommodations and objecting to discrimination.

308.    Defendants took retaliatory actions in response to this protected conduct, including heightened scrutiny and termination.

309.    There is a causal link between Plaintiff's protected activity and the adverse employment actions taken against her.

310.    Defendants' retaliation caused Plaintiff to suffer economic and emotional harm.

## TWENTIETH CAUSE OF ACTION
## SEX DISCRIMINATION (CHRL)
## AGAINST DEFENDANTS

311.    Plaintiff repeats and realleges ¶¶ 1 through 310 of the Complaint as if fully set forth herein.

312.    Plaintiff was subjected to disparate treatment and hostility because of her gender.

313.    Defendants excluded Plaintiff from meetings and undermined her authority in ways not applied to similarly situated male employees.

314.    These actions constitute unlawful gender discrimination under the CHRL.

315.    As a result, Plaintiff suffered financial and reputational harm, as well as emotional distress.

## TWENTY-FIRST CAUSE OF ACTION
## RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY (CHRL)
## AGAINST DEFENDANTS

316.    Plaintiff repeats and realleges ¶¶ 1 through 315 of the Complaint as if fully set forth herein.

317.    Plaintiff was over the age of 40 during her employment and was treated less favorably than younger employees and the Consultant.

318.    Defendants made comments and took actions based on age-related stereotypes.

319.    Plaintiff was excluded from opportunities and ultimately terminated in part because of her age.

320.    Defendants' actions constitute unlawful age discrimination under the CHRL.

321.    As a direct and proximate result, Plaintiff suffered lost wages, diminished professional reputation, and emotional pain and suffering.

322.    Accordingly, Plaintiff seeks all lawful remedies under the applicable statutes, including but not limited to back pay, front pay, compensatory damages, punitive damages, liquidated damages, attorneys' fees, administrative costs, and all other relief that this Court deems just and proper.

## STATEMENT OF CLAIM FOR RELIEF

323.    By the actions and omissions described above, Defendants have violated federal, state and local anti-discrimination laws and wage and hour laws.

## JURY DEMAND

324.    Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court will:

- Find and declare that the conduct of Defendants, individually and collectively, willfully violated Plaintiff's rights under Title VII and the ADA, ADEA, FLSA, NYLL, SHRL, and the CHRL;

- Award Plaintiff back pay, front pay, lost benefits, and all other compensation denied or lost to Plaintiff by reason of Defendants' unlawful conduct, in an amount to be determined at trial;

- Award Plaintiff liquidated damages under the FLSA and NYLL;

- Award Plaintiff compensatory damages for emotional pain and distress, suffering, inconvenience, severe mental anguish, loss of enjoyment of life, loss of dignity, humiliation, embarrassment, stress and anxiety, depression, loss of self-esteem, self-confidence, and personal dignity, damages to reputation and livelihood, loss of career fulfillment, and any other physical or mental injuries endured by Plaintiff in the amount to be determined at a jury trial;

- Award Plaintiff punitive damages under Title VII, the ADA, and the CHRL;

- Award Plaintiff statutory damages for violations of NYLL § 195(1) and § 195(3);

- Award Plaintiff pre- and post-judgment interest as provided by law;

- Award Plaintiff reasonable attorneys' fees, including expert fees, costs, and expenses under federal, state, and city laws, of this action and ensuring compliance with any order for injunctive relief, as provided for in 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5(k) and;

- Grant Plaintiff such other and further relief as this Court deems appropriate and equitable, as may be required in the interest of justice.

Dated: New York, New York
      April 21, 2025

**PITTA LLP**


By:    */s/ Joseph M. Bonomo*
        STEPHEN MC QUADE, ESQ.
        JOSEPH M. BONOMO, ESQ.
        *Attorneys for Plaintiff*
        120 Broadway, 28th Floor
        New York, New York 11554
        212-652-3890
        smcquade@pittalaw.com
        jbonomo@pittalaw.com

4908-9501-2409 v.1